**M & W ELECTRIC MANUFACTURING COMPANY, Plaintiff,**

v.

**GATTO ELECTRIC SUPPLY COMPANY, Defendant,**

and

**Atlas Industries, Intervener.**

**No. 36296.**

United States District Court
N. D. Ohio, E. D.

July 22, 1966.

See also, D.C., 38 F.R.D. 393.

Paul T. O'Neil, Shanley & O'Neil, Washington, D. C., Jack H. Cohen, Cohen & Allison, East Palestine, Ohio, for plaintiff.

Caesar, Rivise, Bernstein & Cohen, Philadelphia, Pa., George M. Austin, Hahn, Loeser, Freedheim, Dean & Wellman, Cleveland, Ohio, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KALBFLEISCH, District Judge.

In this action plaintiff alleges that the manufacture and sale by defendant and intervener of certain offset reducers constitute an infringement of plaintiff's Wayman Patent No. 2,836,437 issued on May 27, 1958, entitled "Eccentric Coupler for Attaching Service Entrance Masts for Meters." Plaintiff seeks an injunction against further infringement of its patent by the defendant and intervener, an accounting for profits and damages, an assessment of costs, an award of reasonable attorneys' fees and an assessment of treble damages as provided for in 35 U.S.C. § 284, and such other and further relief as to the Court may seem just.

The defendant and intervener deny they have wilfully and deliberately infringed plaintiff's patent, either directly or as contributory infringers, and deny that plaintiff is entitled to an assessment of treble damages; and pray that the complaint be dismissed, that the costs of this suit be assessed against plaintiff, that reasonable attorneys' fees be awarded defendant and intervener, and under their counterclaim pray that the Court declare Wayman Patent No. 2,836,437 and the claims therein invalid and void or not infringed by the defendant and intervener, and for such other and further relief as the Court may deem just and proper.

### FINDINGS OF FACT

1. The plaintiff in this action is the M & W Electric Manufacturing Company (hereinafter called "M & W"), an Ohio corporation, having a place of business at East Palestine, Ohio.

2. The defendant, Gatto Electric Supply Company (hereinafter called "Gat-

to"), is an Ohio corporation, having a place of business in Cleveland, Ohio; and the intervener, Atlas Industries Company (hereinafter called "Atlas"), is a Pennsylvania corporation, having a place of business at Scranton, Pennsylvania.

3. Legal title to the Wayman Patent No. 2,836,437, issued May 27, 1958, is vested in M & W by virtue of an assignment from the patentee, Albert J. Wayman (PX 5).

4. Plaintiff is the owner of the entire right, title and interest in and to the patent in suit (T. 347) and all rights or recovery for infringement thereof and has the right to maintain this action.

5. Atlas became a party to this suit by a motion to intervene filed on June 29, 1961, and approved by order of the Court on August 4, 1961.

6. Federal jurisdiction exists since this action arises under the patent laws of the United States, and jurisdiction is conferred by 35 U.S.C. § 281 and 28 U.S.C. § 1338. The Court has jurisdiction over the parties and the subject matter, and no issue is presented as to venue.

7. At trial, the plaintiff withdrew with prejudice all charges of infringement based on claims 1 and 2 of the patent, and the trial was confined solely to claims 3 and 4, the only other claims of the Wayman patent.

8. The patent in suit discloses a service mast installation embodying an offset reducer (PX 2) for forming the connection between the conduit mast and the meter base in the service mast installation.

9. The offset reducer (PX 2) has an upper portion A provided with a smooth external surface for insertion upwardly into the lower end of the mast conduit to provide an external slip fit in which the outer surface of the part A is in sliding contact with the inner surface of the lower end of the mast conduit providing a water-tight connection and permitting relative rotation therebetween.

10. The offset reducer (PX 2) has a lower portion B, in eccentric relation with the upper portion A to provide a range of eccentric adjustment, and is adapted to be connected such as by a threaded nipple to the internal thread of the hub of a meter base located below the service mast conduit.

11. A flange extends outwardly from the offset reducer (PX 2) between the upper A and the lower portion B and provides a surface C for contact with the lower end of the service mast.

12. The offset reducer (PX 2) has means for clamping the offset reducer to the mast conduit and providing ground continuity between the mast conduit and the meter base while, at the same time, not interfering with movement of the offset reducer throughout its full range of eccentric adjustment or to obtain the maximum displacement provided by the eccentricity of the upper and lower portions.

13. Such clamping means, shown as a lug and set screw, is located at an angle approximately or substantially 90° to the axis of symmetry of the coupling device, or at a substantial angle to the axis of symmetry measured from a point on the axis of maximum displacement.

14. In the summer of 1953, the invention of the patent in suit was made by Albert J. Wayman. Patterns for the manufacture of offset reducers in accordance with the invention of the patent in suit were made by Krider Pattern Works of Warren, Ohio (T. 348) and delivered to M & W around mid-August 1953 (T. 347). M & W prepared a price sheet (PX 32) and in September 1953 began manufacture and sale of 2-inch offset reducers, catalogue number 2200 (PX 34) (later modified (PX 64) to reduce metal). Around November 1954 M & W manufactured and sold a 2-inch offset reducer (PX 2) with a slightly greater offset (T. 402) as well as a 2½-inch offset reducer (PX 42).

15. Atlas Industries was organized around June 1957 and Mr. Sebo became general manager. During four years prior to that time, Mr. Sebo was general manager of Arlington Industries of

Scranton, Pennsylvania, a company also involved in the manufacture and sale of electrical fittings. Atlas first put on the market a line of fittings (PX 44) identical to the line of fittings manufactured and sold by Arlington Industries (PX 43).

About the fall of 1958, Mr. Sebo, as a result of making a survey (T. 485), obtained (T. 535, 536), in service entrance mast kits, offset reducers manufactured by Blackhawk (PX 40), Porcelain Products (PX 37) and M & W (PX 2 or PX 34).

16. Mr. Sebo copied directly from the M & W offset reducer (PX 2 or PX 34) and in March or April 1959 (T. 647) began the manufacture and sale of an identical offset reducer (PX 3). About the same time (T. 677) Mr. Sebo began the manufacture and sale of a 2½-inch offset reducer (PX 41) which is identical (T. 607) in all significant respects to an offset reducer manufactured by M & W (PX 42).

17. M & W, through its patent counsel, advised Atlas of its infringement and Atlas agreed to accept a license agreement under the patent in suit (PX 55, PX 56). Months passed without Atlas executing the license agreement and the present suit was filed. Thereafter, around August 1, 1960, M & W was advised (PX 57) Atlas has discontinued the manufacture and sale of the original offset reducer (PX 3) and was manufacturing a modified offset reducer (PX 4). Atlas agreed to accept a license under the patent in suit provided royalties would not be paid with respect to the modified offset reducers (PX 4) unless a Federal Court held that the modified offset reducers infringed the patent in suit. That proposal would not avoid existing litigation and was not accepted.

The Supreme Court of the United States in Graham v. John Deere Company, 383 U.S. 1, 12, 86 S.Ct. 684, 691, 15 L.Ed.2d 545 stated:

"An analysis of the structure of these three sections [35 U.S.C., Secs. 101, 102 and 103] indicates that patentability is dependent upon three explicit conditions: novelty and utility as articulated and defined in § 101, and § 102, and nonobviousness, the new statutory formulation, as set out in § 103."

And, at page 17, 86 S.Ct. at page 693, the Court further stated:

"We conclude that the section was intended merely as a codification of judicial precedents embracing the Hotchkiss [Hotchkiss v. Greenwood, 11 How. 248, 13 L.Ed. 683] condition, with congressional directions that inquiries into the obviousness of the subject matter sought to be patented are a prerequisite to patentability.

"V.

"Approached in this light, the § 103 additional condition, when followed realistically, will permit a more practical test of patentability. The emphasis on nonobviousness is one of inquiry, not quality and, as such, comports with the constitutional strictures.

"While the ultimate question of patent validity is one of law, Great A. & P. Tea Co. v. Supermarket Equipment Corp., supra, 340 U.S. at 155 [71 S.Ct. at 131, 95 L.Ed. 162], the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."

Strictly observing the requirements laid down in Graham v. John Deere, supra, the Court makes the following additional findings:

18. Service mast installations prior to the invention of the patent in suit employed standard pipe fittings or the like to connect the conduit mast to the meter base.

19. The combination of features of the offset reducer (PX 2) including the external slip-fit connection between the offset reducer and the lower end of the conduit mast and the specific position of the clamping means relative to the axis of symmetry makes it possible to form a service mast installation in which the conduit mast is rigidly attached to the wall of the building and in which the meter base is secured flush against the side of the building, irrespective of variations in displacement of the hub of the meter base from the back wall of the meter base.

20. The invention of the patent in suit solved all the problems attendant the prior art service mast installations resulting from the use of standard pipe fittings, i. e., plumbing fittings or other devices requiring installation in the same manner as plumbing fittings, and made it possible not only to provide an improved service mast installation with respect to strength and appearance but also to obtain such improved installation with substantial reduction in cost of material and labor (T. 329–333).

21. The patentee, Albert J. Wayman, is the sole inventor of the invention disclosed and claimed in the patent in suit.

22. None of the prior art relied upon by defendants anticipates the invention of the patent in suit.

23. Defendants copied the M & W products when other devices were available to be copied thus recognizing the advancement in the art made by the invention of the patent in suit.

24. Defendants rely upon the Blackhawk fitting (PX 40), a service mast installation embodying the Blackhawk fitting (DX R 1, 2) and the patents to Langman 2,497,126, Godfrey 1,659,094, Buchanan 1,904,617, Roemhild 2,270,604, Engstrom 1,215,510, and Mikulasek 1,983,866. The Roemhild, Engstrom and Mikulasek patents were all before the Patent Office and the patent in suit was granted thereover.

25. The Blackhawk fitting (PX 40) comprises nothing but a typical plumber's offset reducer made of aluminum instead of steel. The Blackhawk fitting is connected in a service mast installation (DX R 1–2) like a standard pipe fitting and has portions projecting outwardly from the mast conduit when attached thereto (T. 971–975).

26. The Langman patent discloses an electrical conduit fitting forming a connection between a conduit and terminal box. The fitting is offset and has a threaded connection with the terminal box and an internal smooth bore at its other end for receiving therein the end of a conduit, and the conduit and the fitting are rigidly joined together by a crimp. The connection between the conduit and the fitting is an internal slip-fit connection.

27. The Godfrey patent discloses an internal slip-fit connection between conduit 1 and an internal bore formed in the portion 3 of the fitting. A set screw 4 is threaded through the portion 3 for engagement with the conduit and sealing packing 11 is provided to make watertight the internal slip-fit connection.

28. The Buchanan patent discloses a connector for a non-rigid parkway cable used with a service entrance installation not of the mast type. The connector includes several pairs of cooperating conical surfaces for the purpose of forming a water-tight seal or forming a positive electrical contact. The Buchanan patent does not disclose the use of conical surfaces for guiding electrical cables.

29. The Roemhild patent discloses a driving coupling for joining pipes of different diameter in end-to-end axial relation. The coupling device has a deep midsection made of high strength material and of sufficient axial length to

withstand forces applied during the driving operation. The coupling device maintains the pipes in axial relation, as distinguished from offset relation, to permit application of high driving forces.

30. The Engstrom patent discloses a device for coupling a hose to a conventional faucet. The patent discloses a lug and set screw combination for use alone (Figure 1) or in pairs (Figure 4) for securing the device to the end of the faucet. The location of each lug and set screw combination shown in Figure 4 at 90° to the axis of symmetry of the showing of Figure 3 is not critical and may be located in any relation with such axis of symmetry. A pair of lug and set screw combinations in close diametric relation is required.

31. The Mikulasek patent discloses a lug and set screw combination for attaching an air cleaner to a carburetor.

32. None of the prior art relied upon by the defendants discloses the concept of an offset reducer having an external slip fit with a downwardly depending conduit.

33. None of the prior art relied upon by defendants discloses the concept of an offset reducer having an external surface for an external slip-fit connection and clamping means located in specific relation with the axis of symmetry of the offset reducer so as not to interfere with adjustment of the offset reducer throughout the full range of eccentric adjustment or utilization of the maximum displacement of the offset reducer.

34. The invention of the patent in suit as defined by claims 3 and 4 would not have been obvious to one skilled in the art familiar with the teachings of the Blackhawk fitting PX 40, the Blackhawk fitting PX 40 when installed in a service mast installation (DX R 1, 2) and the Langman, Godfrey, Buchanan, Roemhild, Engstrom, and Mikulasek patents, because none of such prior art teaches or suggests two essential features of the invention of the patent in suit, namely, the external slip fit and the specific loca-

tion of the clamping means, namely, lug and set screw D.

35. The patent in suit contains a written description of the invention and of the manner of using it in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains to utilize it in the erection of a service mast installation.

36. Minor errors contained in the specification are not such as to mislead anyone in the art and Dr. Nanis testified he understood the meaning of the word "sleeve" employed in the specification and in the claims.

37. M & W, in filing a petition to make special, followed standard Patent Office procedure, and did not submit false information. The petition was approved by the Patent Office.

38. M & W is not guilty of misuse of the patent in suit and has not violated the Antitrust Laws, nor is M & W guilty of price fixing.

39. The Patent Office held that claim 4 is supported by the original Wayman application filed June 29, 1954, and Gatto and Atlas have offered no evidence to the contrary. The plaintiff had no obligation to disclose the Weaver device which admittedly came into existence a considerable time after June 29, 1954. Atlas's charge of fraud by withholding information on the Weaver device is unsupported as to Mr. Ted Wayman and Attorney Ralph B. Stewart.

40. Atlas manufactured and sold offset reducers for a 2-inch conduit mast (PX 3) and offset reducers for a 2½-inch conduit mast (PX 41) which Atlas admits (PX 17, T. 607) are identical in all material respects to plaintiff's 2-inch offset reducer (PX 3) and plaintiff's 2½-inch offset reducer (PX 42), respectively.

41. Gatto has sold Atlas service mast kits embodying the Atlas offset reducers (PX 3, PX 41) which have been installed in the Cleveland area (PX 22 A, B).

42. At least by September 1960 Atlas stopped manufacturing the original offset reducers (PX 3, PX 41) and began

manufacturing a modified 2-inch offset reducer (PX 4) and a modified 2½-inch offset reducer (PX 20) which differed from the corresponding Atlas original offset reducers in the use of a movable and not a fixed lug.

43. Gatto has sold Atlas service mast kits embodying the Atlas modified offset reducers (PX 4, PX 20) which have been installed in the Cleveland area (PX 21 A, B).

44. Claim 3 of the patent in suit is directly readable upon the Atlas original offset reducers (PX 3, PX 41).

45. Claim 4 of the patent in suit is directly readable upon a service mast installation embodying the Atlas original offset reducers (PX 12, PX 13, PX 22).

46. The movable lug of the Atlas modified offset reducers (PX 4, PX 20) is integral with the remaining part of the offset reducer.

47. The established meaning of the word "integral" is "relating to or serving to form a whole, essential to completeness," as distinguished from a unitary structure or continuity of structure.

48. The patent in issue includes no disclosure that limits the word "formed" used therein to any mode of manufacture including a metallurgical process of manufacture requiring continuity of structure.

49. The term "formed integrally" used in the specification and claims of the patent in suit is not limited by the patent in suit to mean a metallurgical process of manufacture requiring continuity of structure.

50. The term "substantially or approximately 90°" is defined in the patent in suit to mean the positioning of the clamping means (lug and set screw) at an angle to the axis of symmetry of the offset reducer so there is no interference between the lug and the wall to which the service mast installation is assembled, when the offset reducer is rotated through its full range of eccentric adjustment.

51. The term "approximately or substantially 90°" as employed in the patent

in suit and in claim 3 covers an angle greater than and less than 90° and, for an offset reducer for use with a 2-inch conduit mast (PX 2, PX 3, PX 4), the angle defined by the term "approximately or substantially 90°" would be an angle of about 75° to 105°. The number of degrees falling within the term "substantially 90°" increases as the diameter of the offset coupling device increases.

52. The limits on the range of degrees falling within the term "approximately or substantially 90°," as used in the patent in suit and in claim 3 thereof, are established when the position of the lug relative to the wall is such that the set screw cannot be operated by a conventional or ordinary screw driver.

53. Offset screw drivers are available in different sizes, are conventional tools that may be purchased at any hardware store and are not tools made to special order.

54. The term "substantial angle" as used in claim 4 of the patent in suit is defined by the language of the claim to mean an angle so there is no interference between the lug and the wall of the building when the offset reducer is positioned to obtain maximum displacement.

55. The combination of a lug and set screw is shown in Mikulasek Patent 1,-983,866 cited by the Patent Office.

56. The movable lug and set screw combination embodied in the Atlas modified offset reducers (PX 4, PX 20) performs the same work in substantially the same way to accomplish substantially the same result as the lug and set screw combination disclosed in the patent in suit and defined by claims 3 and 4 thereof and embodied in the M & W offset reducers (PX 2, PX 42) and in the Atlas original offset reducers (PX 3, PX 41).

57. The movable lug and set screw combination embodied in the Atlas modified offset reducers (PX 4, PX 20) is a reversal of parts of the fixed lug and set screw combination disclosed in the patent in suit, defined by claims 3 and 4 thereof, and embodied in the M & W off-

set reducers (PX 2, PX 42) and in the Atlas original offset reducers (PX 3, PX 41), and accomplishes the same result.

58. Claim 3 of the patent in suit is directly readable on the Atlas modified offset reducers (PX 4, PX 20).

59. The Atlas modified offset reducers (PX 4, PX 20), when embodied in a service mast installation (PX 15, PX 16, PX 20), infringe claim 4 of the patent in suit by operation of the doctrine of equivalents.

60. The Atlas modified offset reducers (PX 4, PX 20), when embodied in a service mast installation, infringe claim 4 as the difference between the subject matter defined by the claim and the subject matter embodied in the offset reducers is a reversal of parts.

61. M & W offered Atlas a license agreement under the patent in suit which included a provision requiring both parties to sell at the same price offset reducers manufactured under the patent in suit (PX 55).

62. Mr. Sebo testified (T. 740, T. 796) that Atlas did not accept the proposed agreement because counsel advised it involved price fixing.

63. Mr. Sebo testified (T. 797, T. 798) he would not have entered into a patent license agreement requiring Atlas to pay royalties in connection with the manufacture of a device that did not infringe the patent involved.

64. Mr. Sebo had the M & W offset reducer (DX A, PX 40) before him when he "designed" the Atlas original offset reducer (PX 3) and admits copying the features of the lug position (T. 586).

65. Atlas admits the M & W offset reducer (PX 2) and the Atlas original offset reducer (PX 3) are identical in all significant respects (DX 17).

66. In view of the foregoing admissions (paragraphs 63 and 64), it is obvious Mr. Sebo copied completely from the M & W offset reducer (PX 2) in "designing" the Atlas original offset reducer (PX 3) especially since the other devices (PX 39, PX 40) available to Mr. Sebo are obviously dissimilar, appearancewise.

67. Mr. Sebo admits the M & W 2½-inch offset reducer (PX 42) and the Atlas 2½-inch original offset reducer (PX 19, PX 41) are identical in all significant respects (T. 607).

68. A visual comparison of the M & W offset reducer (PX 42) and the Atlas original offset reducer (PX 41) shows almost complete identity even down to the enlarged part of the casing for reinforcing the lug D and, in view of Atlas's admission on identity, it is obvious Mr. Sebo copied completely from the M & W offset reducer (PX 42) when he "designed" the Atlas original offset reducers (PX 19, PX 41).

69. Mr. Sebo testified the M & W offset reducer he had before him when he "designed" the Atlas original offset reducer (PX 3) did not have a patent number marked thereon.

70. Mr. Sebo testified unequivocally at the trial (T. 540–541) that plaintiff's offset reducer (DX A) was the exact device which he obtained from his survey and had before him at the time he designed the Atlas original offset reducer (PX 3).

71. At the trial, Mr. Sebo admitted (T. 563–564) that at his deposition on June 15, 1965 he testified "I doubt it very much" when asked if plaintiff's offset reducer (DX A) was then in existence.

72. Mr. Sebo purchased a second M & W mast kit within six months after the litigation started and before his deposition of June 15, 1965 (T. 567, 568).

73. At the trial (T. 566), Mr. Sebo admitted that when he testified at his deposition of June 15, 1965 he gave an answer which referred to his second purchase of an M & W mast kit.

74. Mr. Sebo testified at the trial that (T. 589, 590) at his deposition of June 15, 1965 he testified that the only feature of the M & W product (PX 2) that he had embodied in the Atlas original offset reducer (PX 3) was the offset feature.

75. Mr. Sebo testified at the trial (T. 586) that at his deposition of November 29, 1965 he admitted copying from the M & W product (PX 2) the feature of locating the lug at 90° and that was the only feature he copied.

76. At the trial, Mr. Sebo testified (T. 585) that he had observed the position of the lug on the M & W offset reducer (PX 2).

77. At the trial, Mr. Sebo testified (T. 586) that at his deposition of November 29, 1965 he admitted copying from the M & W offset reducer (PX 2) and embodying into the original Atlas offset reducer (PX 3) the feature of the positioning of the lug.

78. Mr. Sebo admitted (T. 547, 548) that he had made a mistake in testifying at his deposition of December 3, 1963 when he stated the lug would be positioned at a 45° angle.

79. Mr. Sebo testified (T. 548) the lug would be located on the left as viewed from the front.

80. Mr. Sebo admitted at the trial (T. 550) that the lug of the Atlas original offset reducer (PX 3), when embodied in plaintiff's model (PX 7), was located on the right as viewed from the front.

81. In both of the actual installations of the Atlas offset reducers in the Cleveland area (PX 21, PX 22) the lug is located on the right as viewed from the front.

82. In Gatto's and Atlas's pleadings (answer to paragraph 12(a) of complaint) and in Mr. Sebo's testimony (T. 618, 619) at the deposition of December 3, 1963, with respect to the names of the manufacturers of equipment which Mr. Sebo obtained as a result of his survey, the name of the Weaver Company was not mentioned.

83. After plaintiff identified the Weaver Company (T. 622, T. 700) Atlas, in answer to interrogatory No. 30 (T. 621), added the Weaver Company to the names of manufacturers.

84. Mr. Sebo attempted to explain his earlier exclusion of the Weaver Company by pleading poor memory and that there were a large number of names to remember (T. 701, T. 791).

85. Atlas's advertising material (PX 38) identifies the device D on the Atlas modified offset reducers (PX 4) as being a lug of brass which provides the finest ground possible.

86. At the trial, Mr. Sebo testified (T. 749, 750) that at the deposition of June 15, 1965 he testified the Blackhawk fitting (PX 40) was probably not the exact Blackhawk fitting that he obtained from his survey and which was available to him at the time he designed the Atlas original offset reducer.

87. During the trial Mr. Sebo testified (T. 717) that the Blackhawk fitting (PX 40) was "in front of me" at the time he designed the Atlas original offset reducer (PX 3), and later in his testimony (T. 751) he admitted he could not state that PX 40 was the exact device he had had in front of him.

88. At the trial, Mr. Sebo testified (T. 523, 573) that he had no knowledge of meter bases being manufactured with hubs differently spaced from the back wall of the meter base until so advised by plaintiff's counsel during the taking of his deposition on June 15, 1965.

89. At the trial, Mr. Sebo testified (T. 522) that he understood the patent in suit to disclose the concept of an offset reducer with a range of adjustment for use with meter bases having differently spaced hubs.

90. Mr. Sebo admitted that, at his deposition of June 15, 1965, he was asked "Is there anything technical about it [the Wayman patent] that you do not understand?" He further admitted that his answer was "There isn't anything that comes to my mind at this time." (T. 571–572.)

91. At the trial, Mr. Sebo testified (T. 483, T. 517, T. 595–596) that he had designed the Atlas original offset re-

ducers (PX 3 and PX 41) both to have an offset equal to the displacement between the hub and the back wall of a particular 200 amp. meter base which he had available.

92. In Mr. Sebo's testimony at the trial he stated (T. 600, 601) that the offset of the Atlas original offset reducers (PX 3 and PX 41) was determined by considering the brackets that were used for securing the mast conduit to the wall.

93. Mr. Sebo testified (T. 753, 754) that he designed the original Atlas offset reducers (PX 3 and PX 41) for use with a service mast installation in which the mast conduit was connected to the wall by the use of brackets (conduit spaced from wall) and that he had no concept of the use of his offset reducers with a service mast installation having the conduit connected directly against the wall by means of straps or clamps.

94. Mr. Sebo admitted (T. 761–778) the first Atlas Catalog (DX D) discloses the original Atlas offset reducers (PX 3 and PX 41) and includes pictures of mast kits including as components offset reducers similar to the Atlas original offset reducers (PX 3 and PX 41) both with clamps for attaching the conduit directly against the wall of the building and both with brackets for attaching the conduit in spaced relation to the wall of the building.

95. Mr. Sebo admitted (T. 777) that the attachment of the conduit by straps and the attachment of the conduit by brackets would mean that a different offset would be involved.

96. Mr. Sebo testified (T. 740) that he was advised by counsel not to have anything to do with the M & W proposed license agreement because it involved price fixing.

97. Mr. Sebo testified Mr. Caesar, of Caesar & Rivise, gave him that advice (T. 797).

98. In PX 55, Mr. Caesar states he does not believe the M & W proposed license agreement included an illegal price fixing clause.

99. Mr. Sebo testified (T. 740) he authorized his attorney to decline the license agreement.

100. Atlas accepted the license agreement (PX 55) and thereafter on two occasions expressed willingness to accept the license agreement if limited to the Atlas original offset reducers (PX 57, PX 66).

101. Mr. Sebo copied from two M & W products (PX 2, PX 42).

102. Mr. Sebo copied from the M & W devices without seeking any legal advice.

103. After being advised of infringement of the patent in suit, Atlas changed its offset reducer to the modified form (PX 4, PX 20, PX 59).

104. The difference between the Atlas original offset reducer (PX 3, PX 19) and the Atlas modified offset reducers (PX 4, PX 20, PX 59) is immaterial and the Atlas modified offset reducers obtain all the advantages of the Atlas original offset reducers.

Any finding of fact entered herein which may be properly construed in whole or in part as a conclusion of law shall be so deemed and treated as if set forth under Conclusions of Law.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject matter.

2. Plaintiff is the owner of the entire right, title and interest in and to the Wayman Patent No. 2,836,437 and all rights of recovery for infringement thereof.

3. The Wayman patent is not invalid for non-joinder of joint inventors because the invention described and claimed therein was made by the applicant named therein, i. e., Albert J. Wayman

4. The Wayman patent complies fully with the patent statutes (35 U.S.C. § 112) and is not invalid for indefiniteness or for claiming an old combination.

5. The Wayman patent discloses and claims a patentable invention which is not anticipated by any prior art, and since the difference between the subject matter defined by claims 3 and 4 thereof and the prior art are such that the subject matter as a whole would not have been obvious, at the time the invention was made, to a person having ordinary skill in the art to which said subject matter pertains, said patent is valid.

6. The defenses and charges of Gatto and Atlas that claim 4 is invalid because it covers devices or installations shown in a printed publication available to the public for more than one year before the assertion of claim 4, and that claim 4 is invalid because it covers devices and installations which had been in public use or on sale in this country for more than one year before the assertion of claim 4, are unfounded and without merit; and therefore claim 4 is valid.

7. Plaintiff has not been guilty of any inequitable conduct and has not misrepresented or perpetrated fraud and the Wayman patent is enforceable.

8. Defendant Gatto has infringed claims 3 and 4 of the Wayman patent by selling Atlas original offset reducers and Atlas modified offset reducers.

9. Defendant Atlas has directly infringed claim 3 of the Wayman patent by selling the Atlas original and modified offset reducers and has contributorily infringed claim 4 of the Wayman patent by selling mast kits embodying the Atlas original and modified offset reducers.

10. The determination of all issues as to damages, accounting, attorneys' fees, etc., emanating from this judgment of infringement, has been reserved.

11. Notwithstanding the finding and conclusion that Atlas copied and infringed claims 3 and 4 of the plaintiff's patent, it is my conclusion that the infringement is not and has not been deliberate, willful and wanton.

Judgment will be entered in accord herewith.